PRINCETON UNIVERSITY PRESS, PETITIONER-APPELLANT, v. THE BOROUGH OF PRINCETON, RESPONDENT-RESPONDENT.

Argued April 25, 1961—Decided June 30, 1961.

*Mr. George H. Barlow* argued the cause for petitioner-appellant (*Messrs. Katzenbach, Gildea & Rudner,* attorneys; *Mr. Albridge C. Smith 3rd,* of counsel).

*Mr. Peter T. Bacsik,* on the brief and of counsel, argued the cause for respondent-respondent (*Mr. John F. McCarthy, Jr.,* attorney).

The opinion of the court was delivered by

SCHETTINO, J.   The issue before us is whether the property of Princeton University Press (hereafter referred to as the Press) is tax exempt within the meaning of *N. J. S. A.* 54:4–3.6.

The Borough of Princeton assessed a tax for land, improvements and personalty for 1957.   The Mercer County Board of Taxation denied petitioner's claim of exemption. This action was affirmed by the Division of Tax Appeals on the ground that the property of the Press was not used exclusively for the moral and mental improvement of men, women and children as required by the statute.   The Press appealed and, while the matter was pending in the Appellate Division, we certified it.

An examination of the purposes, structure and activities of the Press is necessary for a disposition of the question. The Press was incorporated in 1910.   The certificate specifically states that the Press is not incorporated for pecuniary profit and the corporation was formed under the laws applicable to non-profit organizations.   *R. S.* 15:1–1.   Its purposes as stated in its certificate have remained unchanged.

"The purposes for which this association is formed are, in the interests of Princeton University, to establish, maintain and operate a printing and publishing plant, for the promotion of education and scholarship, and to serve the University by manufacturing and distributing its publications."

The structure, activities and financial situation of the Press reveal the extent to which the association adheres to these purposes.   The membership consists essentially of past, present and *ex officio* members of its Board of Trustees and the various committees of the Press.   The main function of its membership is to elect the Board of Trustees, a policy-setting body.   The Board itself consists of not more than fifteen individuals, nine of whom are trustees, alumni, or faculty members of Princeton University.   It meets five times annually.   Subordinate to the Board of Trustees are

the officers of the Press and various committees which out-line Press policy in their respective fields. The Editorial Board, which determines whether material is publishable, is appointed by the President of the University and has five members all of whom must be on the University faculty. The Finance Committee, which provides financial manage-ment and supervision, has six members, four of whom are affiliated with the University.

The reason for this close relationship between the Press and the University is clear. As noted, the Press must act "in the interests of" the University and must "serve the University." Additionally, the deed which granted the Press its original land and building specifically provides for a reversion to the University if the Press ceases to act in or serve the University's interests.

The activities of the Press are diversified. A portion of its output consists of scholarly works selected, printed and distributed by the Press. The research for these works is not necessarily done at Princeton, nor need the author be affiliated with Princeton. The Press also publishes the "Princeton Alumni Weekly," which reports the activities of University alumni and plays a part in University fund-raising endeavors. The "Weekly" also contains informative articles on subjects of interest to alumni.

In contrast to its publishing endeavors, the Press engages in activity which can be classified as purely printing work. The Press engages in this printing operation to offset the losses incurred publishing scholarly works. The profit realized from the printing represents a form of subsidy to scholarly publishing. The printing includes work for Prince-ton University such as examinations, letterheads, billheads, football programs, pamphlets and catalogs.

The remaining printing is done for a variety of educa-tional institutions, not affiliated with Princeton, and for other non-profit organizations. Among the educational in-stitutions are Rutgers University, Stanford University, the Lawrenceville School, Sweet Briar College and Mount

Holyoke College. In the year from August 1957 to July 1958 the relative sales breakdown was as follows: scholarly publishing, 46%; the Alumni Weekly, 9%; Princeton University printing work, 21%; outside printing, 24%.

Profit and loss figures are available for the period, 1947-1957. During the years 1947-1954 the publishing activities operated at a loss, which loss, however, was made up by the printing work of the Press. The combined profit and loss figures for that period show that the Press made a profit in every year except in 1952 and 1953.

During the years 1955-1957, however, the financial picture brightened considerably. Both the publishing and the printing phases of the Press's activity operated at a substantial profit. The combined profits for each of these years were in the ninety thousands. The overall financial picture shows that the Press began with a balance of $101,515.51 in 1947 and climbed to $641,231.83 in 1957, resulting in an earned surplus of $539,716.32 for the eleven-year period.

Petitioner claims that under the language of *N. J. S. A.* 54:4–3.6 it is entitled to a tax exemption. The pertinent portions of the statute are as follows:

"The following property shall be exempt from taxation under this chapter: * * * all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes * * * the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose * * * the furniture and personal property in said buildings if used in and devoted to the purposes above mentioned; * * * provided, in case of all the foregoing, the building, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupy-

ing the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes."

The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function. 51 *Am. Jur., Taxation*, § 9, *p.* 42. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption. *Township of Teaneck v. Lutheran Bible Institute,* 20 *N. J.* 86, 90 (1955); *Julius Roehrs Co. v. Division of Tax Appeals,* 16 *N. J.* 493, 497–98 (1954); *Trenton v. State Bd. of Tax Appeals,* 127 *N. J. L.* 105, 106 (*Sup. Ct.* 1941), affirmed *sub nom. Trenton v. Rider College,* 128 *N. J. L.* 320 (*E. & A.* 1942). The burden of proving a tax-exempt status is upon the claimant. *Trenton v. Division of Tax Appeals,* 65 *N. J. Super.* 1, 5–6 (*App. Div.* 1960); *Jamouneau v. Division of Tax Appeals,* 2 *N. J.* 325, 330 (1949); *Trenton v. State Bd. of Tax Appeals, supra,* 127 *N. J. L.,* at *p.* 106; *Princeton Country Day School v. State Bd. of Tax Appeals,* 113 *N. J. L.* 515, 517 (*Sup. Ct.* 1934).

Under the statute, exemption from taxation is tested by exclusiveness both of purpose of the organization and of use of the property for the moral and mental improvement of men, women and children. *Trenton v. Trenton Masonic Temple Ass'n,* 8 *N. J. Misc.* 778 (*Sup. Ct.* 1930), affirmed, 108 *N. J. L.* 419 (*E. & A.* 1932). The statutory language "exclusively used" has met with judicial scrutiny on numerous occasions. In *Sisters of Peace v. Westervelt,* 64 *N. J. L.* 510 (*Sup. Ct.* 1900), affirmed, 65 *N. J. L.* 685 (*E. & A.* 1901), plaintiff conducted a summer boarding house whose patrons paid for accommodations. The court denied exemption on the ground that the building was not used exclusively for charitable purposes. It was noted that although the profits were used to aid the needy, the real

property itself was not used for charitable purposes. In *Trustees of Young Men's and Young Women's Hebrew Ass'n. v. State Bd. of Tax Appeals*, 119 *N. J. L.* 504 (*Sup. Ct.* 1938), affirmed on opinion, 121 *N. J. L.* 65 (*E. & A.* 1938), the property was mainly used for purposes calculated to improve the mental and moral outlook of plaintiffs' members. However, other civic or philanthropic organizations were permitted to maintain offices in the building. The court held that as the occupancy by these organizations was not for the mental and moral improvement of men, women and children of the plaintiff associations, the building was not exclusively used for plaintiffs' purposes. (In passing we note that 11 years after the decision, the Legislature specifically provided for exemption under the facts of this case. See statement attached to A–281, 1949 which became *L.* 1949, *c.* 85.)

In *Girls Friendly Soc'y. v. Cape May*, 20 *N. J. Misc.* 65 (*State Bd., Tax Appeals* 1942), petitioner maintained a building as a summer boarding home for girls and women, some of whom were accommodated free of charge when they could not afford to pay. The petitioner, an Episcopalian society designed to further the welfare of young girls, was found to be organized exclusively for the mental and moral improvement of men, women and children, but it was held that the building was not entitled to exemption from taxation because it was not used exclusively for the purposes of the organization.

In *Township of Teaneck v. Lutheran Bible Institute*, 20 *N. J.* 86 (1955), petitioner was denied an exemption with respect to three residences owned by it, located some two miles from the Institute and occupied by a minister and his family. Holding that these houses were not "actually and exclusively used" in the work of the organization, the court noted that each residence was the center of the minister's family life and this was its "predominant utility." This case is to be contrasted with *City of Asbury Park v. Division of Tax Appeals*, 41 *N. J. Super.* 504 (*App. Div.* 1956).

There, a Salvation Army's Home was used for the organization's officers and employees who were pensioned and retired because of old age or infirmity. Distinguishing the *Teaneck* case, the court granted the tax exemption because the operation of the Home constituted an important part of the work of the religious corporation, namely, taking care of the aged and infirm, which of course included its own retired officers and employees. The court held therefore that the building was "actually and exclusively used" in the organization's work.

A proper application of the "exclusive use" test necessarily depends upon the facts of each case and for this reason the foregoing cases are not controlling here. But they are illustrative of judicial application of the rule of strict statutory construction in this area of the law of tax exemptions.

There is no question that the petitioner has been organized exclusively for the mental and moral improvement of men, women and children. The Press's publication of outstanding scholarly works, which the trade houses would not be apt to publish because of insufficient financial returns, carries out not only the purposes for which it was organized but also performs a valuable public service. It cannot be likewise concluded, however, that the property is *exclusively used* for the mental and moral improvement of men, women and children as required by the statute. A substantial portion of the Press's activity consists of printing work taken in for the purpose of offsetting the losses incurred in the publication of scholarly books. Such printing, which includes work done for educational and non-profit organizations other than Princeton University, is undertaken for the purpose of making a profit. Hence, in this sense the printing takes on the nature of a commercial enterprise and, therefore, it cannot be said that the property is *exclusively used* for the statutory purpose.

Petitioner contends that the printing business conducted by the Press and the profit derived therefrom are for the

purpose of supporting the publication of scholarly books. This fact cannot alter the requirement that the property be exclusively used for the purposes mentioned in the statute. At best, it indicates that the property for which the tax exemption is claimed is being used only indirectly, and not exclusively, for the purpose for which exemption is granted. See *Sisters of Peace, supra,* 64 *N. J. L.,* at *p.* 512.

The outside printing business is not an occasional or incidental activity, or, if engaged in regularly, one which is of an inconsequential or *de minimis* character. It is a substantial, independent and permanent endeavor specifically designed to make a profit. The fact that the Press has realized an earned surplus of $540,000 and has made an annual profit of more than $90,000 per year for the last three recorded years reinforces this conclusion. It cannot be said that the Press has satisfied, as it must, the statutory prerequisite that its property be "actually and exclusively used" in the work of a corporation organized exclusively for the mental improvement of men, women and children.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.